PHARO *et al. v.* BEADLESTON *et al.*

(*City Court of New York, General Term.* December 17, 1891.)

1. SALE—FAILURE TO ACCEPT GOODS—FALSE REPRESENTATIONS.
   Plaintiffs sued to recover the price of thermometers sold to defendants, brewers, on their written order, as an advertising novelty. Defendants set up the false representations of plaintiffs' agent at the time of the sale, that no goods of the same kind had been sold to other brewers, defendants' competitors. *Held,* that the court erred in excluding parol evidence of such representations.

2. SAME—EVIDENCE.
   The evidence excluded in such case showed that the representation that no thermometers had been sold to other brewers was the principal inducement to defendants to give an order, though it appeared that the salesman making the representation was a recent employe, and ignorant of the fact that sales had been made to other brewers. *Held,* that the court erred in directing a verdict for plaintiffs.

Exceptions from trial term.

Action by Allen R. Pharo and others against Beadleston & Woerz to recover damages for failure to accept goods sold. The court directed a verdict for plaintiffs, and defendants move for a new trial on exceptions ordered to be heard in the first instance. Exceptions sustained.

Argued before VAN WYCK and McCARTHY, JJ.

*Guggenheimer & Untermeyer,* for appellants. *E. S. Clinch,* for respondents.

McCARTHY, J. This is a hearing upon exceptions taken at the trial, directed to be heard in the first instance at general term. This action was brought to recover $1,005, damages for breach of contract. The complaint alleges that the defendants contracted in writing with the plaintiffs for the purchase of 2,000 thermometers, at 50 cents each; that the plaintiffs made the thermometers, and offered to deliver them to the defendants, and demanded payment therefor, but the defendants refused to receive them. The answer admits the making of a contract for the furnishing to the defendants of 2,000 thermometers, at 50 cents each, and that the request for the furnishing of the thermometers was made in writing; and alleges for an affirmative defense that the plaintiffs, through their duly-authorized agent, falsely and fraudulently represented that the plaintiffs had not furnished thermometers of the kind offered to the defendants to any other person, firm, or company in the brewing business, either in the city of New York, Brooklyn, Jersey City, Newark, or Hoboken; and that they further agreed and represented by their said agent not to sell or furnish thermometers to any other person, firm,

or company engaged in the brewing business in the aforesaid places. Upon the trial the defendants admitted the allegations of the complaint, and took the affirmative of the issue. The evidence of Alfred N. Beadleston, John D. Cole, John Tully, and Ernst G. W. Woerz established the aforesaid false representations of the plaintiffs' agent, and the conditions upon which the defendants' order was given, as alleged by them. The plaintiffs admitted that prior to the making of the contract in question they had sold thermometers to two brewers, one in the city of New York, and one in Brooklyn. Upon the close of the testimony, the defendants' counsel requested to go to the jury distinctly and separately upon all of the issues raised by the pleadings, upon which testimony had been admitted without objection or exception. The trial judge held that the evidence of the false representations made by the plaintiffs' agent could not affect the validity of the contract relied upon by the plaintiffs, that it contradicted a written instrument, and denied the requests to submit the questions of fact to the jury, and directed the jury to render a verdict for the plaintiffs for the full amount, to all of which rulings the defendants duly excepted. The learned trial judge adopted the view that the representations on which the contract was procured must themselves be in writing, because the contract was in writing.

The defendants set up two separate and distinct defenses in their answer, as follows: "*Third.* It admits that on or about the 15th day of September, 1890, it entered into an agreement with the plaintiffs for the furnishing to it of two thousand thermometers, at the price of fifty cents each, and that the request for the furnishing of the said thermometers was made in writing on or about that day; but it denies that such written request embodied or comprised the entire agreement which they entered into at that time for the thermometers mentioned in the complaint, and it denies that all the terms and conditions of the said contract or agreement are correctly or sufficiently set forth in the complaint in paragraph third thereof. *Fourth.* It admits that the plaintiffs offered two thousand thermometers to the defendant on or about the 1st day of October, 1890, and demanded payment therefor, and that the defendant refused to receive the said thermometers, or to pay for the same; but it denies each and every other allegation in the subdivision or paragraph of the complaint marked and designated therein as 'Fourth.' *Fifth.* It specifically denies that the plaintiffs have duly performed all the conditions of the contract which they made with it on their part to be performed. *Sixth.* Further answering the said complaint, and for a further and separate defense to this action, this defendant alleges that it is engaged in the business of brewing and selling lager-beer and ale in the city of New York and elsewhere; and that the plaintiffs, through their duly-authorized agent, for the purpose of inducing the defendant to enter into an agreement with them, stated and represented that they, the plaintiffs, had not furnished nor sold thermometers, of the kind or character offered to the defendant, to any other person, firm, or company in the city of New York, or in Brooklyn, Jersey City, Newark, or Hoboken, and they further agreed, through their duly-authorized agent, that they would not sell, furnish, or supply thermometers to any other person, firm, or company engaged in the brewing business in any of the places aforesaid. *Seventh.* That the plaintiffs knew that the object of the defendant in ordering such thermometers was to have a novel advertisement, which no other of its competitors had, to give and furnish to its customers for the purpose of advertising its business; that relying upon the truth of the said statements or representations of the plaintiffs, and upon the agreement that they would not furnish or sell thermometers to any other firm, company, or person engaged in the brewing business in any of the aforesaid places, the defendant ordered of the plaintiff two thousand (2,000) thermometers, at fifty cents apiece. *Eighth.* That the aforesaid statements and representations made by the plaintiffs' agent as aforesaid, for the purpose of inducing the de-

fendant to enter into said agreement, were false and untrue, and were known by him to be false and untrue at the time they were made. Upon information, the defendant alleges that the plaintiffs had, prior to the time when such statements or representations were made, furnished and sold thermometers similar in character to those which the defendant ordered, to other brewers located in the aforesaid towns or cities, or some of them, and, contrary to said agreement or representations, sold thermometers to other brewers located in the aforesaid cities or towns, or some of them, and that, upon account of such incorrect and false representations, the agreement that was made in reliance thereon was and is absolutely void, and of no force and effect."

At the opening of the trial, the defendants, in order to secure the affirmative of the case, admitted the allegations of the complaint, and put in evidence the contract in question. This, then, did away with the issues under the first defense.

What was the issue, then, to be tried under the second defense? It was not to contradict, modify, enlarge, or alter the contract, which contract, by the withdrawal of the first offense, was admitted, but to avoid it by reason of alleged false and fraudulent representations. It does not seem to us that both the court and appellants' counsel did not observe the full effect of this withdrawal. See *Mayer* v. *Dean*, 115 N. Y. 560, 22 N. E. Rep. 261. NELSON, C. J., in *Sandford* v. *Handy*, 23 Wend. 265, says: "We may remark that the proof proposed did not go to vary the terms or conditions of the contract, which seems to be implied in the reason assigned at the trial for the rejection, but to show that the defendants were induced to enter into it, as drawn, in consequence of the fraudulent representations of the agent in respect to the subject-matter,—the property sold,—and which was material in forming an estimate of its value. The legal effect of the representations we will examine hereafter. For the present, we assume they were sufficient to go to the jury on the point of fraud, and the question is whether they were competent to affect the plaintiff in that aspect of the case." It did not and could not deprive the defendants from avoiding the contract by reason of the false and fraudulent representations. See *Bennett* v. *Judson*, 21 N. Y. 239; *Stuart* v. *Lester*, (Sup.) 1 N. Y. Supp. 699; *Conner* v. *Keese*, 105 N. Y. 643, 11 N. E. Rep. 516.

The facts which the defendants proved on the trial of this case, if uncontradicted, were sufficient, in our opinion, to prevent a recovery in this action.

Alfred N. Beadleston, a witness called on behalf of the defendants, and duly sworn, testified: "I am a brewer, and a member of the firm of Beadleston & Woerz. I have been engaged in the brewing business for a great many years in the city of New York. We have a large trade. I remember the occasion of placing the order for these thermometers. The gentleman who solicited the order is in court. He did not get the order on the first occasion when he called. On that occasion he said he represented a house that made thermometers, and suggested that we adopt the mode of advertising; that he was anxious to get some representative in different industries, and they only wanted one in each class of business. He instanced the fact that Huyler & Co., the candy people, were the only ones in their line, and that they confined themselves to that one house, and suggested that there were no brewers in New York or vicinity that had them, and that, if we would be a customer for them, we would be the only ones that would have them. At that interview Mr. Pottberg and Mr. Cole, both of whom are in our employ, were present, as well as Mr. Tully, one of the firm of Upham & Co., sign-makers, who attend to all our advertising outside,—sign-work. I asked Mr. Tully for his opinion regarding the advisability of it, and he said if he could have the exclusive use of those things he thought it would be a very good mode of advertising. I don't know what the solicitor for the plaintiffs may have said to Mr. Tully. They may have had some conversation. I

think they went over about the same ground as with me. We talked about half an hour. I told him I would consider his proposition, and for him to call in a few days, and I would let him know; and he did call again, on which occasion I gave him the order. At that time Mr. Woerz and myself were present. I told him I would give an order for many thousand more, if they turned out well. Mr. Woerz had not met the gentleman before, so we went in the private office, and we went over substantially the same ground with him. He said again that we would be the only customers for these thermometers they made, not only brewers who were located in New York,. but who did business in New York, who might have their factories elsewhere. He said we would be able to carry out the idea we had of advertising,—that is, have a novelty in our line of business,—and thereupon we gave the order for two thousand. He said the same thing to Mr. Woerz,—that no other brewers had them, and no other brewers would have them. I relied upon that statement, and gave him the order for two thousand. Then he asked me to sign this paper, which I looked upon as an order for him to take. I signed the order. There was an advantage in having the exclusive use of these thermometers as an advertisement. The advantage was in having something in the way of our advertisement,—a novelty that other people in our line of business do not have. After the contract was made, I had several calls from the plaintiffs. I had several interviews. I remember, 1 think, but three,— two, at least. The first was the salesman, accompanied, I think, by one of his employers, came to suggest to us that they had sold only these two brewers. I think that the salesman told me that he had recently become connected with this house, and did not know that fact. We had notified them that we would not receive the thermometers. We did not want them. We found several of them outside, among customers in the trade, and, inasmuch as he had misrepresented the thing to us, and that was a fact, we did not want them. Then he called, and the salesman told me he was sorry the thing had occurred; that, as far as he was concerned, he was innocent in the matter; that he did not know that those brewers had been furnished with any; that he had been only connected with this house for a few days, I think; and that, however, but two houses had them, and they had not a great many, and they would not be supplied with any more, or no one else, if we would consent to take these thermometers. I told him we did not care to take them after they were already out. The novelty had gone, and we did not want to issue 'chestnuts.' On two or three occasions they called and wanted to see me. I don't think I had any further interview in regard to the matter, except with one gentleman, whom I don't know, and he said he would insist upon our taking them. I told him we would not take them. Well, he said he would do something about it. Well, I told him he knew what his remedy was. Then another gentleman called, some months or so afterwards, and said they had these things on hand, and could we not use them at any price,—make some use of them? I told him, ' No.' We went over the same ground,—the reason we ordered them. I think the gentleman is here. I am not sure. It is some time ago. I told him I did not want to imitate other brewers. I told him I did not want them at any price. *Cross-Examination.* I mean to say that the gentleman who first called upon me, in reference to the placing of the order, had said that they had furnished Huyler & Co. with thermometers similar in form, and as a representative of the confectionery trade. I am quite sure that he said that no other brewers had been furnished with thermometers. I don't know that it is a fact that for the past fifteen years a brewing firm has used a thermometer in connection with its signs or advertisement. I do not recall a sign upon which is a bottle in the center of which a thermometer is placed, and which sign or advertisement is used by a brewing firm. I have never seen it. I am only famil-

iar with the various devices used by us for advertising purposes. I am not acquainted with the general market. I have said that, after I had learned that other brewers had these thermometers, I sent word to the plaintiffs that, inasmuch as their representations were untrue, I would not accept the thermometers. By what means that word was sent I am unable to state. I gave notice in the office personally. I don't know that it was sent. I don't know what method they took to notify them. I simply gave orders to that effect. I won't say that any such order was sent. The representation, substantially, which I claim this agent made, was that our concern of Beadleston & Woerz would be the only customers in our particular trade for these thermometers. *Redirect.* Did I understand you to say that they were the only persons who had the thermometers? *Answer.* Had or would have. We were the first people he had approached. He said that no one had them, and, if I took them, nobody else would have them. *Question.* You have been asked about notifying them—the plaintiffs—that you would not take them. The people who called to induce you to take them appeared to know that you had refused? *A.* They called before they attempted to deliver them. It appeared to be in answer to a notice. *Recross.* The letter which is shown me came from my place of business, (witness looking at paper.) It was written by Mr. Pottberg. He is here in court. I presume that the letter shown me is the notice that was sent under my instructions. That is the notice that I should think was sent under my direction. (Paper referred to read in evidence, and marked 'Plaintiff's Exhibit A:' 'Cable Address, Monocle, per Str. BEADLESTON & WOERZ, BREWERS AND MALTSTERS, EMPIRE BREWERY, NEW YORK, Oct. 2, 1890. [Empire Brewery. Trade-Mark. Lager-Beer Dept.] *Perfection Therm. Co., City*—GENTLEMEN: Please let your agent call some time to-morrow A. M., in reference to your order. Also stop working on same until you hear from us again. Yours, truly, BEADLESTON & WOERZ. POTTBERG.')"

John D. Cole, a witness called on behalf of defendants and duly sworn, testified: "I am a book-keeper for Beadleston & Woerz, and have been for nearly ten years. I remember the occasion when the solicitor for the plaintiffs called to get this order. I was present at the interview. Mr. Pottberg was there. I think Mr. Tully was there,—in fact, I know he was; and, really, I don't know who else was there, at the time. Mr. Beadleston was also there. I was present only at one interview. That was before the order was given. The gentleman came in there, and showed the sample that he had; and at first Mr. Beadleston did not seem to want to take his time to look at it, but finally this gentleman said: 'We are going to put this into every branch of trade, and have one thermometer in each trade.' And then Mr. Beadleston looked at it, and asked the opinion of different ones who were there, —Mr. Pottberg and myself and Mr. Tully,—and we all thought it might be a pretty good thing if only one branch of trade had it, but otherwise it would not be worth anything; and Mr. Beadleston, after talking a while, wanted to know if any other brewer had it. The party said, 'No,' and he told him to call in again in a day or two, and we would make up our minds what to do about it. The gentleman who solicited the order is here. He said no brewer had it in New York or Brooklyn or vicinity. He even put in Hoboken or Newark. If Beadleston & Woerz took it, he said no one else would have it. I am positive as to that. As a novelty, it was thought to be a good thing. I did not know of any other brewer having any such advertisement. I don't know now of any other brewer who had such an advertisement, nor did I know of any at that time. *Cross-Examination.* I think I can almost use the exact language of the representative. This gentleman came in, as all advertisers do, and offered this sample, and solicited our advertisement; but the gentleman said no other brewers had it, and, if we would give him an order,

no other brewers would have it but us. This is his exact language. I regarded thermometers as a novel means of advertising, if we were the only parties that had it. It had never before been used as a means for advertising in the brewery business. I believe some wagon-house uptown had a thermometer a year before that. That is the only case came to my knowledge. I did not know then, nor do I know now, that for fifteen years before it had been extensively used as a means of advertising, and I don't know now."

Carl Pottberg, a witness for the defendants, being duly sworn, testified: "I am a book-keeper at Beadleston & Woerz, and have been there about ten years. I was present at this interview at which the order for thermometers was solicited. There was also present Mr. Beadleston and Mr. Tully and Mr. Cole. I remember part of what took place. I was not present at any more than one interview. I heard Mr. Beadleston say to the salesman that he gave this order with the idea only that no other brewer would have these thermometers. *Question.* That no other brewers— *Answer.* Would have these thermometers. I don't know whether he said anything about whether any other brewer had them, as I was not there the whole time. That is all I heard. I did not hear him ask the agent any questions. I was not present while the agent answered any questions. I just passed by, through that office, and I heard no more. *To Plaintiffs' Counsel.* The signature to the contract (defendants' Exhibit No. 1) is that of Mr. A. N. Beadleston's. *To Defendants' Counsel.* At that interview Mr. Alfred Beadleston did not call me in for my opinion of this thing. After the salesman had gone he asked my opinion. I wrote this notice, (referring to plaintiffs' Exhibit A.)"

John Tully, a witness called on behalf of defendants, having duly affirmed, testified as follows: "I am in the painting and decorating business. I have dealt largely with Beadleston & Woerz for a great many years, having charge of their advertising. They have been extensive advertisers, always advertising in a novel way. I was present when the party solicited the order. I heard this solicitor solicit the advertisement from Mr. Beadleston, and he stated to him that no other brewer had the thermometers, and that, if he gave them the order for the thermometers, he was the only one who would have them. He said that Beadleston & Woerz would be the only brewer, as I understood him; and Mr. Beadleston appealed to me for my opinion of the advertisement. I told him, if it was an exclusive thing for their business, it was a good thing. Then I volunteered to make a design of their exclusive advertisement,—that is, their style of advertisement, the lettering on this thermometer,—which I did, and furnished it to this young man, this salesman. The young man had a thermometer there at the time. I had never seen any other brewer who had this form of advertisement. I regarded it as a novelty, only as an exclusive advertisement. The thermometers now shown me, without the lettering, is the character of thermometer the young man showed when he first called. The lettering was put upon it from a plate from a design furnished by me. *Cross-Examination.* At the time this thermometer was presented to Mr. Beadleston the plaintiffs did not submit a design for lettering upon it. This sheet of paper is my work, (paper shown witness.) I furnished it to the plaintiffs that they might put the words upon the thermometer that are now on it. I furnished it to give the idea. I did not know that he wanted to get a wood-cut for the transfer of my design to the thermometer. I did not know that the transfer had to be made by means of a wood-cut. It might have been made by a stencil. A stencil will produce that kind of work. The letters would be ragged, but I told him they could be trimmed up in that way."

Ernst G. W. Woerz, a witness called on behalf of the defendants and duly sworn, testified: "I am one of the concern of Beadleston & Woerz, and re-

member the time when Mr. Alfred Beadleston signed the order for these ther-
mometers.   I was present at the time.   This young man, the salesman for
the plaintiffs, was the person who presented the order.   At that time it was
said that no other brewer was to have the thermometer but ourselves, and
under that condition the order was given.   The young man said there was no
others except ours.   There would be no other brewers who would have it.
That there would be no other brewers having the thermometer.   Upon that
the order was signed.   We were talking about the novelty among ourselves;
that it would be a nice advertisement.   I was speaking to Mr. Beadleston
about it in the presence of this young man.   We thought it was a nice adver-
tisement for one concern to have it alone.   It was new, I thought.   I never
had seen any thermometer advertisements before, and we took it because of
the novelty."

It is admitted by plaintiffs' counsel that plaintiffs had sold thermometers
to the Empire State Brewery, in the city of New York, and the Long Island
Brewery, in the city of Brooklyn.   These facts were, however, controverted
by the plaintiffs' witnesses, and thus it became a question of fact for the jury.
We think the court, therefore, erred in refusing to allow the defendants to go
to the jury on the propositions requested by them, and to which refusal excep-
tion was duly taken.   The court erred in directing a verdict for the plaintiffs.
The exceptions were well taken.   See *Hall* v. *Erwin*, 66 N. Y. 649.   See,
also, cases already referred to.   For these reasons the judgment should be
set aside, and new trial granted, with costs to the defendants to abide the
event.